**2021 UT App 81**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
JAMES HUDSON MAIN JR.,
Appellant.

Opinion
No. 20190119-CA
Filed July 22, 2021

Eighth District Court, Duchesne Department
The Honorable Samuel P. Chiara
No. 161800433

Laura J. Fuller, Attorney for Appellant

Sean D. Reyes and Marian Decker, Attorneys
for Appellee

SENIOR JUDGE KATE APPLEBY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and DIANA HAGEN concurred.[1]

APPLEBY, Senior Judge:

¶1      James Hudson Main Jr. was convicted of murder. On appeal he challenges several of the district court's evidentiary determinations. He argues that the court admitted evidence of other crimes in violation of rule 404(b) of the Utah Rules of Evidence, that phone records he sought to admit should not have been excluded on the basis that they lacked foundation, and that color photographs of the crime scene should have been excluded because they were gruesome. We reject these arguments and affirm.

---

1. Senior Judge Kate Appleby sat by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(7).

BACKGROUND[2]

¶2　Main and his father (Father) were staying at Father's remote cabin and experiencing interpersonal conflict during the week leading up to Father's death. Father called 911 twice that week, first expressing that he was "afraid" of Main and needed help from law enforcement, and then in the second call reporting that Main had stolen his gun. According to some witnesses, Main seemed paranoid that week, thinking "everybody was trying to kill him" and, in particular, that Father was trying to poison him. At some point, Main shot and killed Father and fled in Father's truck.

¶3　Main drove Father's truck to the house of his friend, D.N. D.N. and his girlfriend were asleep and "woke up to a gun in [their] face[s]." Main told them he had just "shot [Father] in the head and splattered his brains all over the cupboards" and suggested that he was willing to shoot them too. Main then asked for dry clothing and for all their electronic devices. After Main changed into the clothing they provided and secured the electronics in a bag, the three went into the kitchen, where D.N.'s girlfriend gave Main some food.

¶4　The three moved outside, with Main still in possession of the gun. He stated, "Well, we need to get out of here." Because D.N. had been having problems with his car and was worried that it would stall, he suggested they use his work van. But after they climbed into the van, D.N. realized he did not have the key to it. At this point, Main fired a warning shot at the ground, telling D.N. to "[h]urry up," and D.N. decided they should go ahead and take his car. D.N. drove the three of them in his car to

---

2. "We recite the facts in a light most favorable to the jury verdict. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Vallejo*, 2019 UT 38, ¶ 2 n.1, 449 P.3d 39 (quotation simplified).

their friends' house "to get some dope." During the drive, D.N. was focused on trying to make sure his car did not stall because Main had threatened that if the car stopped or the police pulled them over, he would shoot D.N. and D.N.'s girlfriend.

¶5 When they arrived at the friends' house, Main changed his mind and "decided he didn't want to be there." But when D.N. tried to leave, his car's brakes "grabbed," which prompted Main to say, "You're dead," and D.N. "heard the hammer click right then." D.N. suddenly released the clutch, and as the car stalled and jerked forward, D.N. lunged toward Main to try to wrestle the gun from him. It discharged during the struggle, shooting out one of the car's windows. The two continued to struggle over the gun, and when D.N.'s girlfriend opened the car door, the two men fell out, with D.N. landing on top of Main.

¶6 Having heard the gunshot, the friends came out of the house and joined in the struggle, ultimately succeeding in getting the gun away from Main. Main jumped into D.N.'s car and fled to D.N.'s house, where he left the car and retrieved Father's truck.

¶7 When police arrived at the friends' house, D.N. gave them the gun and told them Main said he shot Father. Police conducted a welfare check at the cabin and discovered Father's "obviously deceased" body inside. They began searching for Main and ultimately captured him in Colorado the following day.

¶8 In the course of their investigation, police searched D.N.'s house and vehicles, finding several pieces of evidence related to the murder: Main's gun holster, found in D.N.'s driveway; Main's jeans, with Father's blood on the bottom of one leg, found in D.N.'s car; Main's blood-stained jacket, found inside D.N.'s work van; and Main's bloody shoes, found in D.N.'s bedroom.

¶9 Main was charged with aggravated murder, aggravated burglary, two counts of aggravated robbery, two counts of aggravated kidnapping, felony discharge of a firearm, possession of a firearm by a restricted person, carrying a loaded firearm in an unlawful place, attempted aggravated murder, and two counts of assault. After a preliminary hearing, the district court determined there was probable cause to bind over Main on the lesser included offense of murder, but not on aggravated murder because the acts supporting the aggravating factor were not part of the same criminal episode.

¶10 The defense successfully moved to bifurcate the remaining eleven charges from the murder charge. As a result, evidence supporting the bifurcated charges was not initially expected to be admitted during the murder trial. But during questioning on the first day of trial, it became clear that the defense strategy was to suggest to the jury that D.N. was the perpetrator based on his connection with the case, specifically, that much of the evidence was found at D.N.'s house and in his vehicles, that he told police Father had been shot, and that Father's gun was in his possession. At this point, the district court addressed whether some evidence of the bifurcated crimes—in particular, evidence of the interactions between Main and D.N. and "subsequent events"—would be allowed or whether rule 404(b) of the Utah Rules of Evidence prohibited its presentation. The court determined that the evidence was "outside the scope of 404(b)" because "the crimes are so linked . . . with the crime charged in this case, in time and circumstances, that one cannot be shown without proving the other, or there are facts that must be shown in order to explain evidence and where it was found and why it was found in this case." The court also determined that the evidence passed the balancing test articulated in rule 403 of the Utah Rules of Evidence, reasoning that (1) the evidence in question was "all highly probative of why the [physical] evidence was found in [D.N.]'s possession" and "why [D.N.] made reports that he [was]

alleged to have made" and that (2) the evidence was not unfairly prejudicial because it was "not something that [would] cause a heightened emotional response in the jury" and because the bifurcated charges were "less serious" than the murder charge at issue in this case. The court also offered to include a jury instruction to clarify the evidence's limited purpose.[3] Thus, D.N. was allowed to testify about some of the events related to the bifurcated crimes.

¶11 In an attempt to challenge D.N.'s credibility, specifically by rebutting his testimony that Main had taken the electronics and put them in a bag, the defense sought to introduce phone records from D.N.'s cell phone showing three data transmissions during the period in question. The State objected on multiple grounds, including hearsay, relevance, and lack of foundation. The district court agreed with the defense that the document fell within an exception to the rule against hearsay. But the court agreed with the State that the evidence lacked foundation, ruling that it would not be received because the defense had presented no expert or other individual with personal knowledge who could explain and interpret what the data transmissions represented.

¶12 The district court also preemptively ruled on the admission of two color 8"x11" photographs of the crime scene that the State intended to offer as exhibits to show that Father was shot inside the cabin. The first photograph, State's exhibit 35-A, showed Father in "his deceased condition" and "a fair amount of dried blood," but no "graphic wounds." The second photograph, State's exhibit 35-B, was a closer view of content included in the first photograph, showing in greater detail Father's uninjured right shoulder and arm, as well as "a small

---

3. The following jury instruction was given: "You may consider this evidence, if at all, for the limited purpose of providing context for the evidence presented in this case."

amount of dried blood." The defense objected on the grounds that the photographs were "gruesome," arguing that this made their use unfairly prejudicial. After analyzing several factors, the court determined that the photographs were highly probative as to where Father was shot and whether his body was moved after he was shot. The court also found that, while 35-A was somewhat "unpleasant," neither photograph was gruesome or unfairly prejudicial. Therefore, the court was prepared to allow admission of the photographs should the State so request.

¶13　The trial proceeded with the State presenting testimony from a police detective who had discovered Father's deceased body and taken photographs of it in the cabin. But the State did not initially move for admission of either of the contested photographs. On cross-examination, however, defense counsel requested admission of the first photograph:

> [DEFENSE COUNSEL]: The [defense] would move for the admission of State's Exhibit 35.[4]
>
> THE COURT: The defense has moved for the admission and the Court will receive it.
>
> [PROSECUTOR]: And it is marked as State's Exhibit 35-A.
>
> THE COURT: Yes. This is, was marked as State's Exhibit 35-A. It has been offered by the defense and is received.

---

4. According to the transcript, defense counsel apparently stated by mistake that the *State* was moving for admission of *exhibit 35*, when by context it is clear that he meant that the *defense* was seeking to introduce *exhibit 35-A*.

[DEFENSE COUNSEL]: May I publish that to the jury, Your Honor?

[PROSECUTOR]: No objection.

Later, in questioning another police detective, the State referred to and then sought admission of the second photograph:

THE COURT: [Prosecutor], 35-A had been offered by the defense.

[PROSECUTOR]: That's correct.

THE COURT: 35-B's not been offered.

[PROSECUTOR]: That's correct. And the State now moves—well, the State now offers 35-B.

THE COURT: Subject to the defense's objection I'll receive 35-B.

[DEFENSE COUNSEL]: (Inaudible).

THE COURT: Okay. No objection at this time.

Thus, each photograph was admitted into evidence and shown to the jury.

¶14 The jury ultimately found Main guilty of Father's murder. Main now appeals, contesting several of the district court's evidentiary rulings.

ISSUES AND STANDARD OF REVIEW

¶15 First, Main argues that the district court should have excluded evidence related to the bifurcated charges under rule 404(b) and that such evidence also was unfairly prejudicial

under rule 403. "We review a trial court's decision to admit evidence under rule 404(b) of the Utah Rules of Evidence under an abuse of discretion standard." *State v. Lucero*, 2014 UT 15, ¶ 11, 328 P.3d 841 (quotation simplified), *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. Likewise, "[a] trial court's decision to admit evidence under rule 403 of the Utah Rules of Evidence is reviewed for an abuse of discretion." *State v. Kell*, 2002 UT 106, ¶ 29, 61 P.3d 1019.

¶16 Second, Main argues that the district court erred in not allowing introduction of the phone records from D.N.'s cell phone based on the lack of foundation. Although we determine that the court's decision was based largely on relevance concerns, our review is for abuse of discretion under either ground, *see Chapman v. Uintah County*, 2003 UT App 383, ¶ 7, 81 P.3d 761 ("The trial court has broad discretion in determining the relevancy of offered evidence, and error will be found only if the trial court abused its discretion." (quotation simplified)); *State v. Torres*, 2003 UT App 114, ¶ 7, 69 P.3d 314 ("A trial court's determination [as to whether] there was a proper foundation for the admission of evidence will not be overturned unless there is a showing of an abuse of discretion." (quotation simplified)).

¶17 Finally, Main argues that the two crime scene photographs of Father's deceased body should not have passed the rule 403 balancing test because, although relevant, there was a great danger of unfair prejudice because they were gruesome. Again, "[t]he responsibility of weighing relevance against prejudice is that of the trial judge, and [that] decision will not be overturned by this Court unless it is shown to be an abuse of discretion." *State v. Garcia*, 663 P.2d 60, 64 (Utah 1983).[5]

---

5. Main also makes a cumulative error argument, but because he shows no individual errors, the cumulative error doctrine does not apply. *See State v. Galindo*, 2019 UT App 171, ¶ 17 n.4, 452

(continued…)

ANALYSIS

I. Evidence Related to the Bifurcated Charges

¶18 Main argues that the district court erred by allowing evidence that violated rule 404(b) of the Utah Rules of Evidence.[6] Under that rule, evidence of a defendant's other crimes "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character," although such evidence "may be admissible for another purpose." Utah R. Evid. 404(b). But the rule "applies only to evidence that is extrinsic to the crime charged." *State v. Lucero*, 2014 UT 15, ¶ 14 n.7, 328 P.3d 841 (quotation simplified), *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. And "if the evidence of [other] acts is inextricably intertwined with the crime that is charged, or if both the charged crime and the [other] act are considered part of a single criminal episode, then rule 404(b) would not apply."[7] *Id.* (quotation

---

(…continued)
P.3d 519 ("There are no errors to accumulate here, rendering the cumulative error doctrine inapplicable in this case.").

6. The State argues that although Main objected at trial to the use of this evidence, his objections were not sufficiently specific and clear to preserve the issues he pursues on appeal. But because we resolve these matters in the State's favor, we need not address whether they are preserved. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 ("[I]f the merits of a claim can easily be resolved in favor of the party asserting that the claim was not preserved, we readily may opt to do so without addressing preservation." (quotation simplified)).

7. We note that although case law frequently refers to rule 404(b) evidence as "prior bad acts" evidence, the rule itself makes no
(continued…)

simplified). Instead, "the act would be considered part of the case narrative and have important probative value that bears directly on the crime charged." *Id*.

¶19   Here, as the case progressed and the defense theory of the case—blaming D.N. for the murder—became clear, the court realized that the evidence related to the bifurcated charges was inextricably intertwined with the facts presented in the murder case:

> [The evidence presented raises] the question of how did all of those things happen? How did the bloody clothing come to be in [D.N.]'s car and house? . . . Why did [D.N.] have the firearm ultimately? And why did [D.N.] know to call for the welfare check? All of those things are integral to the State's case. Now that those issues have been raised as a defense, likely defense, in the case, the Court finds that the evidence of the other crimes . . . are within the res [gestae] of the charged acts; that the crimes are so linked, the subsequent crimes are so linked with the crime charged in this case, in time and circumstances, that one cannot be shown without proving the other, or there are facts that must be shown in order to explain evidence and where it was found and why it was found in this case. And so it is outside the scope of [rule] 404(b). It is not being used as character evidence, but it is being used as direct evidence of facts in this case.

---

(…continued)
reference to "prior" acts. *See State v. Von Niederhausern*, 2018 UT App 149, ¶ 21 n.6, 427 P.3d 1277. Instead, the rule addresses all "[e]vidence of a crime, wrong, or other act," whether occurring before or after the actions at issue in the current case. *See* Utah R. Evid. 404(b).

¶20   The district court next turned to the issue of unfair prejudice under rule 403. *See* Utah R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ."). It determined that the evidence of the bifurcated charges was "highly probative" of why all the incriminating evidence was in D.N.'s possession and why he made the police report. The court further determined that evidence of the bifurcated charges was "not something that [would] cause a heightened emotional response in the jury that is unfairly prejudicial," particularly where the bifurcated charges were less serious than the murder charge. And the court also said it would "certainly allow" an instruction to the jurors "that they may use that evidence only for the evidentiary purposes and not to draw conclusions with regard to the homicide." Thus, the court ultimately concluded, "the probative value is so great that it outweighs any prejudice by presenting the evidence" and "the evidence . . . passes the balancing test under Rule 403."

¶21   The district court did not abuse its discretion in determining that the evidence was inextricably intertwined. The evidence regarding the bifurcated charges was necessary to explain D.N.'s relationship to many pieces of inculpatory evidence. Thus, evidence regarding the bifurcated charges was necessary to rebut the defense's argument that D.N.'s connection to the inculpatory evidence indicated that he was the true perpetrator. And the court did not abuse its discretion in determining that any danger of unfair prejudice from the evidence was not so great as to "substantially outweigh[]" its high probative value, *see id.*

¶22   Much of Main's argument on this topic takes issue with the district court making a "complete reversal of its prior ruling" and allowing evidence after previously determining that it "was so prejudicial as to require it be bifurcated." This argument is unavailing. First, it mischaracterizes the court's prior ruling. The court's prior ruling determined that all the crimes initially

charged were not part of the same criminal episode, which resulted in failure to show an aggravating factor for the aggravated murder charge, and therefore the court instructed the State to file an amended information reducing that charge to the lesser offense of murder. Although the defense thereafter successfully moved to bifurcate the charges, Main identifies nothing in the record in which the district court determined that the charges must be bifurcated because of their highly prejudicial nature.[8] Second, as Main acknowledges, there was a change in circumstances between the court's pretrial rulings and its rulings at trial: the court had learned that the defense strategy would be to suggest D.N. was "the true perpetrator." Third, whether the evidence regarding the bifurcated charges and the murder were inextricably intertwined is not necessarily the same determination as whether the crimes were all part of the same criminal episode. *See Lucero*, 2014 UT 15, ¶ 14 n.7 ("If the evidence of [other] acts is inextricably intertwined with the crime that is charged, *or* if both the charged crime and the [other] act are considered part of a single criminal episode, then rule 404(b) would not apply." (emphasis added) (quotation simplified)). Thus, it is possible to have a situation in which the crimes are not part of a single criminal episode yet the evidence of one is inextricably intertwined with another.

¶23 Some confusion on this matter may be traced to Main's reliance on *State v. Thornton*, 2014 UT App 265, 339 P.3d 112, *aff'd in part, rev'd in part*, 2017 UT 9, 391 P.3d 1016, in which this court explained one relationship between the two terms: "When the charged crime and the [other] act are considered part of a single criminal episode, the evidence is inextricably intertwined and

---

8. We also note that the court's ultimate rulings—that the aggravated murder charge be reduced to a murder charge and that the remaining charges be bifurcated from the murder charge—remained unchanged.

rule 404(b) is not implicated." *Id.* ¶ 43 (quotation simplified). Nevertheless, at most, this language instructs that when crimes are part of a single criminal episode, the evidence necessarily will be inextricably intertwined. It does not preclude the possibility that crimes that are *not* part of a single criminal episode might also have evidence that is inextricably intertwined.[9]

¶24 Furthermore, we note that the distinction under the facts here is largely immaterial. The same considerations that supported the district court's determination that the evidence was inextricably intertwined and therefore outside the scope of rule 404(b) also would have supported the conclusion that the evidence was admissible under rule 404(b). *See generally State v. High*, 2012 UT App 180, ¶ 16, 282 P.3d 1046 ("[Rule 404(b)] evidence is admissible if it is offered for a proper, noncharacter purpose, if it is relevant under rules 401 and 402 of the Utah Rules of Evidence, and if its probative value is not substantially outweighed by the danger of unfair prejudice under rule 403 of the Utah Rules of Evidence."). The court discussed how the evidence of the bifurcated charges was being used and

---

9. We do, however, recognize the "concerns with using [other] acts evidence to 'complete a story' or 'explain the circumstances' of an alleged criminal act" and realize that an overly broad definition of "inextricably intertwined" might be problematic in such scenarios. *See State v. Thornton*, 2014 UT App 265, ¶ 43 n.10, 339 P.3d 112 (quoting *United States v. Bowie*, 232 F.3d 923, 928 (D.C. Cir. 2000)), *aff'd in part, rev'd in part*, 2017 UT 9, 391 P.3d 1016. But the evidence here regarding the bifurcated charges was not used simply to provide a fuller narrative for the jury; instead, the evidence was used to explain why all the incriminating evidence was produced by D.N. and to rebut the defense theory that D.N.'s involvement with the incriminating evidence suggested that he was the real perpetrator.

determined, "It is not being used as character evidence, but it is being used as direct evidence of facts in this case." Thus, the court determined that the evidence was being offered for a proper, noncharacter purpose. And where the court characterized the evidence here as being "integral to the State's case," it certainly considered the evidence relevant.[10] Finally, the court performed an unfair prejudice analysis and concluded that danger of unfair prejudice did not substantially outweigh the probative value of the evidence. Thus, the result here would remain unchanged under the rule 404(b) analysis Main advocates.[11]

## II. Phone Records

¶25   On cross-examination, defense counsel asked D.N. whether his cell phone records would show "zero activity" during the time Main allegedly had possession of the electronics, and D.N. responded, "Yes." Later, the defense wanted to impeach D.N. by presenting his cell phone records, which showed three data transmissions during the time in question. The State objected on multiple grounds, including hearsay and absence of foundation. The district court ultimately excluded the evidence for lack of foundation.

¶26   Main argues that because the district court determined the phone records met an exception to the rule against hearsay,

---

10. Main concedes the evidence is relevant.

11. Because we determine the evidence was properly admitted, we need not separately address Main's argument that the district court erred in refusing to grant his motion for a mistrial based on these same arguments that the evidence of the bifurcated charges was improperly admitted in violation of rule 404(b).

they should not have been excluded for lack of foundation.[12] But the court's ruling that the phone records lacked foundation did not relate to whether a proper foundation had been laid for their admission under the hearsay rules, but rather whether there was adequate foundation to establish the phone records' relevance. The court's concern clearly was not whether the phone records were reliable records but, rather, that their relevance was not established without additional testimony:

> [T]o be able to interpret what the data means, we would need either an expert or someone with personal knowledge of how [the cell phone company's] system works, one of the two. And they would need to be able to explain what the outgoing data—three times when this [phone] sent information. But we don't know what that means without an expert or a person, someone with personal knowledge of [the cell phone company's] system to interpret what that data means. And because there's no one here to lay foundation for the meaning of the document . . . . [i]t's not going to be received because of a lack of foundation.

Thus, the court's determination was specifically based on the failure to lay foundation for *the meaning of* the phone records, that is, to establish their relevance.[13]

---

12. We express no opinion regarding the district court's analysis of either the business records exception, *see* Utah R. Evid. 803(6), or the residual exception, *see id.* R. 807, to the rule against hearsay.

13. Main recognizes that the State's objection to this evidence was also made on the grounds of relevance.

¶27 We determine that the district court did not abuse its discretion in this decision. The defense presented no evidence to show whether the data might represent automatic data transmissions of some kind or whether they indicated actual phone usage initiated by some manual action. And without such evidence, the relevance of the records was not established. *See* Utah R. Evid. 401 (defining relevant evidence as evidence that "has any tendency to make a fact [of consequence] more or less probable than it would be without the evidence"). That is, without any foundational information establishing that the data transmissions indicated actual manual phone use, the phone records were irrelevant to impeach D.N. Because the relevance of these documents for impeachment purposes required knowing precisely the kinds of transmissions they represented and because Main had no witness to supply that information, we cannot say the district court abused its discretion in excluding them.[14]

### III. Crime Scene Photographs

¶28 Main argues that the district court erred in admitting two crime scene photographs. Although defense counsel initially objected to the admission of the photographs as "unfairly prejudicial due to [their] gruesome nature," the defense ultimately, on cross-examination, moved to admit exhibit 35-A and publish it to the jury. "Under the doctrine of invited error,

---

14. Main argues, in essence, that any problems of foundation were the result of a timing issue caused by the district court's change of course in admitting evidence of the bifurcated charges and therefore the court should have granted a continuance to address any lack of foundation. But as the State correctly points out, Main never requested a continuance. Although the record included some discussion of surprise, no one requested a continuance.

we have declined to engage in even plain error review when counsel, either by statement or act, affirmatively represented to the trial court that he or she had no objection to the proceedings." *State v. Winfield*, 2006 UT 4, ¶ 14, 128 P.3d 1171 (quotation simplified). Thus, because the admission of exhibit 35-A was invited error, we do not engage in review of the propriety of its admission.[15]

¶29    But we do address on the merits the admission of exhibit 35-B, which the State moved to admit and which the court received "[s]ubject to the defense's objection."[16]

> All relevant photographs, regardless of their alleged "gruesomeness," are subject to the balancing test set out in rule 403. Thus, upon a challenge to the admissibility of a photograph, the

---

15. In response to the State's arguments, Main's reply brief raises several ineffective assistance of counsel claims. We will not consider these claims because "it is well settled that issues raised by an appellant in the reply brief that were not presented in the opening brief are considered waived and will not be considered by the appellate court." *State v. Lorenzo*, 2015 UT App 189, ¶ 12, 358 P.3d 330 (quotation simplified).

16. The State argues, pointing to an exchange between the district court and the defense, that the defense waived its prior objection to the admission of exhibit 35-B. But because the transcript is somewhat unclear as to the precise exchange on this issue and because the issue is easily resolved on its merits, we address it. We do, nonetheless, acknowledge that such a waiver by the defense seems likely, considering that it had already introduced exhibit 35-A, which was the more graphic of the two photographs and included the subject matter depicted in exhibit 35-B.

court "may exclude relevant evidence if its
probative value is substantially outweighed by a
danger of one or more of the following: unfair
prejudice, confusing the issues, misleading the
jury, undue delay, wasting time, or needlessly
presenting cumulative evidence."

*Met v. State*, 2016 UT 51, ¶ 89, 388 P.3d 447 (quoting Utah R. Evid. 403). "Unfair prejudice within [the rule 403] context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Maurer*, 770 P.2d 981, 984 (Utah 1989) (quotation simplified).

¶30    Exhibit 35-B depicted Father's uninjured right arm and shoulder, as well as the right side of his body. The photograph showed "several drops of blood on items in the cabin and on [Father's] hand and it show[ed] a small amount of dried blood above his shoulder." The district court, noting that "the defense called into question during the trial whether [Father] was perhaps shot somewhere outside the cabin," determined that exhibit 35-B was probative "with regard to the question of where [Father] was shot and whether his body was moved or not." The court then determined that the probative value of the photograph was not substantially outweighed by the risk of unfair prejudice.

¶31    This determination was not an abuse of the district court's discretion. Exhibit 35-B did not show Father's face or any of his wounds; indeed, the only arguably unpleasant content of the photograph was the depiction of a small amount of dried blood. Furthermore, the content of this photograph was wholly contained within the comparably more disturbing exhibit 35-A introduced by the defense, which showed more blood and Father's entire body. It is unlikely that a closer look at some of the dried blood would have such an impact on the jury that it would make its decision on a purely emotional or other improper basis. In sum, we see no likelihood that the probative

value of exhibit 35-B was "substantially outweighed" by a danger of unfair prejudice, *see* Utah R. Evid. 403, and we affirm on this issue.

## CONCLUSION

¶32    The district court did not abuse its discretion in allowing evidence relating to the bifurcated charges, in refusing to admit the phone records, or in allowing the admission of exhibit 35-B. We therefore affirm.

_____