**2025 UT App 198**

## THE UTAH COURT OF APPEALS

WEST VALLEY CITY,
Appellee,
*v.*
ROMEO MARQUIS DRAWN,
Appellant.

Opinion
No. 20240763-CA
Filed December 26, 2025

Third District Court, Salt Lake Department
The Honorable Vernice S. Trease
No. 221911572

Staci Visser, Attorney for Appellant

Ryan Robinson and Corey D. Sherwin,
Attorneys for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES RYAN D. TENNEY and JOHN D. LUTHY concurred.

MORTENSEN, Judge:

¶1 One day in the fall of 2022, Romeo Marquis Drawn was watching his son Jeremy's little league baseball game.[1] Jeremy's mother, Ruth, and her boyfriend, Ken, were also there. When Jeremy came up to bat, Ken encouraged him to keep his "eye on the ball." Apparently taking offense, Drawn told Ken not to talk to his son, and a fight between the two men ensued. Ken walked away with a broken arm, and Drawn was charged with and convicted of assault with substantial injury. He appeals, asserting an ineffective assistance claim based on his trial counsel's failure to properly address certain other-acts and character evidence that

---

1. We use pseudonyms when referring to nonparties in this opinion.

West Valley City introduced at trial. While we hardly endorse the approach taken by the prosecution, we nevertheless affirm.

BACKGROUND[2]

¶2     Drawn had previously been in a relationship with Ruth, and they shared a son, Jeremy. One day in September 2022, Ruth and her boyfriend, Ken, went to the park to watch Jeremy's little league baseball game. Drawn, who was also at the game, had never met Ken, and Ruth was worried about possible trouble between the two men. To mitigate at least some of that concern, Ruth and Ken sat apart from Drawn's parents, Diana and Fred, who, in turn, were sitting apart from Drawn.

¶3     When Jeremy came up to bat, Ken encouraged Jeremy to keep his "eye on the ball." Apparently taking offense, Drawn approached Ken and said, "Don't talk to my fucking son." Ken responded, "I don't think you should be doing this to your son." A few minutes later, Ken began walking over to the restroom. What happened next was disputed at trial. But under the facts the jury apparently accepted, Drawn approached Ken and asked, "What now tough guy?" Ken responded, "I'm not doing this with you." Drawn then "jump[ed] on [Ken's] back," and the two men "went straight to the ground." Observers intervened and broke up the fight.

¶4     Ruth called the police, and two officers arrived. One officer (Officer) was speaking with other witnesses when Drawn approached him. Drawn initially told Officer that Ken had

_____

2. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly. We present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Barlow*, 2025 UT App 152, n.2, 579 P.3d 422.

punched him in the forehead. Drawn subsequently changed his story, saying that he had tackled Ken after dodging a punch.

¶5     After giving their statements to the officers, Ruth and Ken were told that they "were free to go." Ken thought his arm had been dislocated in the fight, so Ruth drove him to the hospital. An x-ray revealed that Ken's arm was broken and he needed surgery. Drawn was then charged with assault with substantial bodily injury.

¶6     Early in the proceedings, an attorney (who did not represent Drawn at trial) filed a request for discovery on Drawn's behalf. Among other things, the attorney requested that West Valley City (the City) "[p]rovide notice, pursuant to Rule 404(b) of the Utah Rules of Evidence, of [its] intent to present evidence of other crimes, wrongs, or acts as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The City did not provide any such notice before trial.

¶7     At trial, Ken, Ruth, Diana, Fred, and Officer testified consistently with the above. Aside from Fred, each witness testified to additional information that is relevant on appeal. The prosecutor asked Ken what he knew about Drawn through Ruth. Ken responded that Ruth had told him that Drawn was "unhinged." Drawn's trial counsel (Counsel) objected on hearsay grounds. The district court overruled the objection, concluding the statement was appropriate to establish why Ken and Ruth were not sitting next to Drawn at the game. Nonetheless, the court instructed the jury not to consider the statement for the truth of the matter asserted.

¶8     Ruth explained that she and Ken had been sitting apart from Diana and Fred at the game "in hopes of not upsetting" Drawn. In response to the prosecutor's question about why she thought there could be an issue, Ruth stated, "Just based on history with [Drawn] and some anger problems, we just didn't

want to cause any confrontation, and so we decided to sit separately just to not tick him off in any way." The prosecutor then asked Ruth whether Drawn had "said anything to [her] specifically that would cause [her] to fear that there would be a problem." Ruth began to answer that Drawn had not said anything that day when Counsel objected based on rule 404(b)(1) of the Utah Rules of Evidence, which bars "[e]vidence of a crime, wrong, or other act . . . to show that on a particular occasion the person acted in conformity with the character." The record of the ensuing sidebar is somewhat unclear, but the prosecutor appears to have agreed to "tailor" the question to address the concern raised by Counsel.

¶9    After the sidebar, the prosecutor asked Ruth whether Drawn had said anything to her "leading up to this baseball game that would give [her] a reason to think there would be a problem while [she was] at the game." Ruth responded, "That day, no." The prosecutor then asked, "What about prior to that day?" Ruth responded, "Oh, prior to that day, yes. He told me not to have any communications with [Diana] and [Fred], and neither should [Jeremy] . . . . [Drawn] also gave me fear of bringing any kind of man into my life that [Jeremy] would be around." When the prosecutor asked Ruth to clarify what she meant, Ruth responded that Drawn "would just say things like, 'Nobody should be in [Jeremy's] life. It's too early.'" At this point, Counsel objected on both rule 404(b) and relevance grounds. The prosecutor insisted that he was "not trying to dig up all of their prior history" and that he "just want[ed] to know why they didn't come and sit together." The court overruled the objection, apparently on the ground that Drawn's statement could not be "a 404(b) bad act."[3]

---

3. The caselaw frequently—and, in our view, unfortunately— "refers to rule 404(b) evidence as 'prior bad acts' evidence." *State v. Main*, 2021 UT App 81, ¶ 18 n.7, 494 P.3d 1056. In fact, the rule is limited to neither "prior" nor "bad" acts. *See id.* (cleaned up).

(continued…)

¶10 Diana testified that when Drawn approached Ken and told him not to talk to Jeremy, she started recording the encounter because of a prior incident in which Drawn had acted "aggressive[ly]." Counsel again objected based on rule 404(b). After a sidebar, the prosecutor agreed to rephrase the question in a way that would avoid the 404(b) issue. The prosecutor then asked Diana, "Without going into prior incidents, isn't it true . . . that you took the phone out because you were worried [Drawn] might do something?" Diana responded, "Absolutely."

¶11 Officer testified that Drawn told him that "the other involved parties . . . weren't allowed to be there any longer" and "that they needed to leave." According to Officer, Drawn then stated that he was in the process of obtaining a restraining order—presumably against Ruth and Ken, and possibly against Diana and Fred—but that it hadn't been served yet. Officer testified that neither he nor any other officer had been "hostile" toward Drawn during the investigation. He also stated that Drawn's conduct was inconsistent with how people had behaved during the "hundreds, maybe thousands" of investigations that he had "conducted as a uniformed police officer." Officer then elaborated,

> [P]olice get there for a reason. We control the scene . . . the best we can so that we can do a thorough investigation. [Drawn was] more so animated and argumentative and a little boisterous. . . . [During my] first initial contact with [Drawn], I was speaking with the other parties. He approached me and was demanding that they leave and go, and was in my face the whole time. And I was like, "Excuse

The rule instead addresses "[e]vidence of a crime, wrong, or *other act* . . . to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character," Utah R. Evid. 404(b)(1) (emphasis added), "whether occurring before or after the actions at issue in the current case," *Main*, 2021 UT App 81, ¶ 18 n.7.

me. I need you to go back over there, and I'll come over there." And then later, [Drawn] was very accusatory saying that I was very hostile towards him. Later in the incident, there were several times where he would call dispatch explaining that he was—I believe—was an unarmed Black man, [who] was afraid for his life . . . and so "send more police officers."

Counsel did not object to this testimony.

¶12    After the City rested its case, Drawn called a single witness (Bystander). Her son was on Jeremy's team, and she had been watching the game. She testified that Ken, who is white, said "Let's do this, boy," and shoved Drawn "with both hands in the chest." Bystander stated that the two men "were fighting" and "ended up on the ground" before others "broke up the fight." She also testified that she had not previously known any of the people involved in the situation. On cross-examination, Bystander acknowledged that before she "heard or saw anything, the altercation had already begun."

¶13    The jury convicted Drawn as charged.

ISSUE AND STANDARD OF REVIEW

¶14    On appeal, Drawn asserts a claim of ineffective assistance of counsel. Where, as here, a defendant raises such a claim for the first time on appeal, we decide it as a matter of law. *State v. Fleming*, 2019 UT App 181, ¶ 7, 454 P.3d 862.

ANALYSIS

¶15    To demonstrate ineffective assistance of counsel, a defendant must show that "(1) counsel's performance was

objectively deficient and (2) the deficient performance resulted in prejudice." *State v. Fleming*, 2019 UT App 181, ¶ 9, 454 P.3d 862. Where a defendant fails to make a showing of deficient performance, a court need not address prejudice. *See Strickland v. Washington*, 466 U.S. 668, 697 (1984). On the deficient performance prong, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The ultimate question the court must answer is "whether, considering all the circumstances, counsel's acts or omissions were objectively unreasonable." *State v. Scott*, 2020 UT 13, ¶ 36, 462 P.3d 350.

¶16 Drawn asserts that "Counsel rendered ineffective assistance by failing to exclude, object [to], or otherwise remedy the . . . admission of unnoticed and inadmissible character evidence." Specifically, Drawn argues that Counsel should have objected to Officer's testimony, which he claims constituted improper other-acts evidence under rule 404(b) of the Utah Rules of Evidence and should have otherwise been excluded under rule 403. He also maintains that Counsel should have more effectively addressed the improper evidence introduced by the testimony of Ken, Ruth, and Diana. We address each argument in turn.

### I. Officer's Testimony

#### A. Rule 404(b)

¶17 Drawn argues first that Officer's testimony ran afoul of rule 404(b) of the Utah Rules of Evidence because it centered on "Drawn's behavior towards law enforcement that occurred well after the incident with [Ken]" and the City used it "to impugn Drawn's character and diminish his credibility." Drawn maintains that Counsel rendered deficient performance by "fail[ing] to ensure that the jury did not hear and consider evidence from [Officer] that Drawn made 'false' allegations . . . and that Drawn was unusually boisterous and argumentative with officers during the investigation." As we explain below, rule

404(b) does not apply to Officer's testimony because it was properly admitted as intrinsic evidence.

¶18    Our supreme court recently explained that "[e]vidence is intrinsic and thus outside the scope of rule 404(b) when there is a direct relationship between the act and the charged crime." *State v. Blackwing*, 2025 UT 60, ¶ 31. "To be considered intrinsic, the acts must be an integral and natural part of the circumstances surrounding the offense for which the defendant is charged or directly connected to the factual circumstances of the crime." *Id.* (cleaned up). Importantly, "intrinsic evidence can arise from conduct that occurs [before and] after the crime is completed." *Id.* ¶ 33.

¶19    In *Blackwing*, the defendant was in jail pending trial for a rape charge. *Id.* ¶ 1. He was subsequently charged with solicitation, conspiracy, and attempted aggravated murder when he "allegedly directed three women with whom he had a polygamous relationship to murder" the alleged victim to keep her from testifying at trial. *Id.* ¶¶ 1, 10. As relevant here, the supreme court ruled that evidence related to the rape charge was intrinsic to the other charges and therefore "not subject to rule 404(b)." *Id.* ¶ 34. Specifically, because the defendant tried to orchestrate the murder to avoid punishment, there was "a direct relationship between the sexual assault and the crimes for which [the defendant was] on trial." *Id.*

¶20    Officer's testimony was clearly intrinsic evidence under *Blackwing*. The interactions between Officer and Drawn occurred in the near aftermath of the incident Officer was investigating. Drawn was charged with assault after that investigation. In other words, there was a direct relationship between how Drawn interacted with Officer and the crime with which he was charged. We also note that "police officers routinely testify about the demeanor of persons giving statements to them, even when the recorded statement has been admitted into evidence." *Johnson v. State*, 375 S.W.3d 12, 24 (Ark. Ct. App. 2010). Indeed, our cases

have allowed officers to testify about a defendant's demeanor and behavior during an initial police response. *See, e.g.*, *State v. Haar*, 2021 UT App 109, ¶ 61, 500 P.3d 102 (noting, in a murder case, that the officer's testimony about the defendant's "behavior in the immediate aftermath of [the victim] becoming unresponsive" was properly considered by the jury as evidence of the defendant's consciousness of guilt); *State v. Amboh*, 2023 UT App 150, ¶ 38, 541 P.3d 299 (concluding that body camera footage of the officer's encounter with the defendant supported the officer's testimony that the defendant was "openly hostile" during arrest on charges of driving without insurance and interfering with a peace officer); *State v. Glasscock*, 2014 UT App 221, ¶ 23, 336 P.3d 46 (explaining that the defendant's "demeanor throughout the interview simply did not provide the detectives with any reason to question his mental stability" and affirming the trial court's conclusion that the defendant's statement was voluntary).

¶21 For these reasons, rule 404(b) did not apply to Officer's testimony. An objection on this basis would therefore have been futile, which precludes a finding of deficient performance. *See, e.g.*, *State v. Soto*, 2022 UT App 107, ¶ 31, 518 P.3d 157.[4]

B. Rule 403

¶22 Drawn also argues that Officer's testimony was excludable under rule 403 and that Counsel should have objected on that basis. The rule enables a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Utah R. Evid. 403. District courts apply rule 403's well-known balancing test by "identify[ing] the probative

---

4. To the extent Drawn argues that Counsel should have objected to Officer's testimony because the City failed to provide notice under rule 404(b)(2) of the Utah Rules of Evidence, that argument is foreclosed by our conclusion that Officer's testimony was intrinsic evidence and, thus, not subject to rule 404(b), including its notice requirement.

value of the evidence" and weighing it against the "unfair prejudice that may result from the evidence." *State v. Nunez-Vasquez*, 2020 UT App 98, ¶ 58, 468 P.3d 585. "In the usual case, the presumption [under the rule] is in favor of admissibility." *Id.* (cleaned up).

¶23 Drawn maintains that the probative value of Officer's testimony was low because "Drawn's behavior after the altercation did not . . . make it any more or less likely that [he] started the physical altercation." To the extent Drawn argues that the evidence was *irrelevant* under rules 401 and 402 of the Utah Rules of Evidence, we disagree for reasons we've already discussed. *See supra* ¶¶ 17–20. We also note that a defendant's interactions with law enforcement in the aftermath of an alleged crime can have probative value. *See, e.g.*, *Haar*, 2021 UT App 109, ¶ 61.

¶24 On the other side of the test, Drawn points to Officer's testimony that Drawn called 911 multiple times during the encounter when he "explain[ed] that he was . . . an unarmed Black man, [who] was afraid for his life . . . and so 'send more police officers.'" This, Drawn argues, "is the sort of evidence that evokes an emotional response in jurors, particularly given the existing social climate in recent years." We don't disagree that testimony implicating contentious societal issues risks "inflam[ing] passions and ignit[ing] conscious or subconscious biases." *State v. Beverly*, 2018 UT 60, ¶ 38, 435 P.3d 160. District courts and litigants should be cognizant of such risks.

¶25 However, we cannot conclude that Counsel's decision not to object to Officer's testimony on rule 403 grounds was objectively unreasonable. Even if the substance of Drawn's 911 calls should have been excluded under rule 403, it remains true that Officer "spontaneously volunteered" a potentially inadmissible opinion. *State v. Herrera*, 2025 UT App 1, ¶ 26, 563 P.3d 416. In such scenarios, an attorney's options are limited. Here, Counsel could have moved for a mistrial, sought a curative

instruction, or not objected at all. Drawn does not argue that Counsel should have sought a mistrial based on Officer's testimony. And it was not until close to the end of his answer to a question from the prosecutor that Officer testified Drawn had called 911 and said that he "was an unarmed Black man." So, had Counsel objected and asked for a curative jury instruction, he risked bringing the "pink-elephant paradox" into play, which refers to the phenomenon that jurors, when they are "told *not* to think about a thing, . . . may actually be more likely to think about that thing." *State v. King*, 2024 UT App 151, ¶ 33, 559 P.3d 96. Objection in such an instance is the kind of tactical decision that we are extremely reluctant to second-guess. *Id.*; *cf. State v. Hamberlin*, 2025 UT App 131, ¶ 37, 577 P.3d 912 (noting that appellate courts "are loath to second-guess" "quintessential strategic decision[s]").

¶26    On the facts here, we cannot say that Officer's testimony was so damaging that Counsel's only reasonable choice would have been to object to the testimony. Had Officer said more on the subject, Counsel may have been obligated to object and seek a curative instruction (or even a mistrial) because the longer the testimony was drawn out, the more likely the jury would have been to remember it. But Officer's potentially objectionable testimony was brief and spontaneous. Under these circumstances, reasonable counsel could choose not to object.

¶27    For these reasons, Drawn has failed to establish that Counsel rendered deficient performance in not moving to exclude Officer's testimony under rule 403.

## II. Other Witness Testimony

¶28    Drawn argues next that Counsel should have done more to address the damage caused by Ken's, Ruth's, and Diana's testimony related to his character and other acts. For reasons we

explain below, we cannot say that Counsel's performance was deficient in this regard.[5]

¶29   As an initial matter, to the extent Drawn argues that Ken's and Ruth's testimony that he was "unhinged" and had "anger problems" was inadmissible under rule 404(a)(1) of the Utah Rules of Evidence, we agree. *See* Utah R. Evid. 404(a)(1) ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in conformity with the character or trait."). Indeed, the evidence centered on a character trait—Drawn's propensity for anger or acting out on that anger.[6] *See State v. Graydon*, 2023 UT App 4,

---

5. Drawn briefly argues, again, that Counsel should have sought to exclude much of this testimony based on the City's failure to provide notice under rule 404(b)(2) of the Utah Rules of Evidence that it intended to offer other-acts evidence at trial. On this front, Drawn is correct that the City should have given notice. *See* Utah R. Evid. 404(b)(2) ("On request by a defendant in a criminal case, the prosecutor must: (A) provide reasonable notice of the general nature of any [other-acts] evidence that the prosecutor intends to offer at trial; and (B) do so before trial, or during trial if the court excuses lack of pretrial notice on good cause shown."). But Drawn does not explain why the trial court would have—or should have—excluded the evidence instead of granting a continuance. *See State v. Alvarado*, 2014 UT App 87, ¶ 27 n.5, 325 P.3d 116 (explaining that a court's decision based on the government's "failure to provide notice . . . would likely trigger the same analysis as under rule 16 [of the Utah Rules of Criminal Procedure], that is, the application of the requirement to request a continuance"). Without any such explanation, Drawn's argument on this point does not help his case.

6. We noted in the introduction that we cannot endorse the approach taken by the City in prosecuting this case—its elicitation

(continued…)

¶ 64 n.10, 524 P.3d 1034 ("Character evidence . . . includes evidence of specific traits or propensities a person might have, some of which might be negative even if the person could be considered generally a good person." (cleaned up)). We likewise assume for the sake of argument that some of Ruth's and Diana's testimony constituted other-acts evidence.[7]

¶30    But Counsel objected to nearly all of the challenged testimony, including Ken's and Ruth's clearly inadmissible statements about Drawn's general character. That Counsel did not necessarily object on the strongest or proper grounds strikes us as a relatively minor oversight here.[8] Short of a mistrial—a remedy that Drawn does not meaningfully argue Counsel should have requested in this case, *see infra* ¶ 33—mitigating the problems caused by Ken's, Ruth's, and Diana's testimony implicated, again, the tactical decision of whether to object further and ask for a curative instruction or to forgo objection in the hopes of not emphasizing the improper testimony for the jury. *See State v. King*, 2024 UT App 151, ¶ 33, 559 P.3d 96.

¶31    Here, Counsel objected to Ken's testimony that Drawn was "unhinged," after which the district court explained to the jury

---

of this kind of testimony is why. The question to Ken was phrased in a way that the prosecutor should have known would risk a response that Drawn was unhinged—an obvious attempt to introduce inadmissible character evidence.

7. We need not and do not opine on whether the district court was correct in its apparent ruling that Drawn's statements to Ruth were not "other acts" under rule 404(b).

8. As noted above, Counsel objected to Ken's testimony that Drawn was "unhinged" on hearsay grounds, not on the basis that it was character evidence. Similarly, Counsel objected to Ruth's testimony that Drawn had "anger problems" because it was other-acts evidence, not because it was character evidence.

that it could not consider the testimony for "the truth of the matter asserted." Given that the jury heard the testimony, we cannot say that the jury's calculus would have changed had it been instructed that it couldn't consider the testimony for *any* reason. In fact, the pink-elephant paradox may have even been more problematic in such a situation. *See id.* And Drawn does not explain what difference—if any—there would have been had Counsel made the stronger objection or if he had asked the court for a second curative instruction.

¶32 Similarly, Counsel's objection to Ruth's testimony about Drawn's alleged proclivity for anger steered the discussion toward Drawn's specific acts. This brings us, again, to the requirement that we grant broad deference to trial counsel on decisions that are quintessentially tactical in nature. Because requesting a curative instruction on Ruth's testimony would have risked placing undue attention on that testimony, we decline to second-guess Counsel's apparent decision not to request such an instruction. The same is true for Counsel's decision about how to handle Diana's testimony.

¶33 Drawn also argues—very briefly—that Counsel should have requested a mistrial based on some of this testimony. We have explained that "a mistrial is a drastic remedy, which should be granted only where the circumstances are such as to reasonably indicate that a fair trial cannot be had and that a mistrial is necessary to avoid injustice." *State v. Sorenson*, 2023 UT App 159, ¶ 21, 542 P.3d 529 (cleaned up). Stated otherwise, a "mistrial is warranted only when no reasonable alternatives exist." *Id.* (cleaned up). Drawn does not explain why a mistrial would have been appropriate in this case. Moreover, by arguing relatively extensively that Counsel should have sought curative jury instructions, Drawn suggests that there *were* reasonable alternatives short of a mistrial that the court could have considered.

¶34   Finally, Drawn argues again that any probative value of Ken's, Ruth's, and Diana's testimony was substantially outweighed by a danger of unfair prejudice under rule 403 and that Counsel therefore rendered deficient performance by not objecting on rule 403 grounds. On the facts, we disagree that Counsel's actual decisions were objectively unreasonable. Again, Counsel objected to most of the challenged testimony, and either the court instructed the jury on how it could consider the evidence or the prosecutor agreed to tailor his question in a way that would avoid the problem raised by Counsel. Had Counsel objected on rule 403 grounds, the jury would have still heard much—if not all—of the testimony. This brings Counsel's decision on what to do about that testimony squarely within the presumption that the decision was objectively reasonable.

¶35   For these reasons, we cannot say that Counsel rendered deficient performance in how he chose to address the problems created by Ken's, Ruth's, and Diana's testimony.

## CONCLUSION

¶36   Drawn has not established that Counsel rendered deficient performance in this case. Therefore, his ineffective assistance claim fails, and we affirm his conviction.

―――――――――