**2026 UT App 2**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ROBERT GILHAM NEWBERRY,
Appellant.

Amended Opinion[*]
No. 20230121-CA
Filed January 8, 2026

Third District Court, Salt Lake Department
The Honorable Amber M. Mettler
No. 211901783

Freyja Johnson, Rachel Phillips Ainscough, and Anna
Grigsby, Attorneys for Appellant

Derek E. Brown and David A. Simpson,
Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES RYAN M. HARRIS and RYAN D. TENNEY concurred.

LUTHY, Judge:

---

[*] This amended opinion replaces the opinion issued in this case on November 28, 2025. After that opinion issued, the appellant filed a petition for rehearing, and we called for a response. In his petition, the appellant noted that also on November 28, 2025, the Utah Supreme Court issued its opinion in *State v. Blackwing*, 2025 UT 60, which, like this case, involves the issue of intrinsic evidence. We grant the petition in part and issue this amended opinion, which contains a new paragraph 44 and revisions to current paragraphs 45, 47, and 48 in light of *Blackwing*.

¶1 Robert Gilham Newberry was convicted of unlawful sexual activity with a minor, Becca.[1] He now asks us to reverse his conviction, asserting that (1) the district court abused its discretion by admitting evidence in violation of rule 404(b) of the Utah Rules of Evidence and (2) his trial counsel (Counsel) rendered ineffective assistance by (a) failing to object to additional evidence Newberry argues was inadmissible under rule 404(b) and (b) eliciting certain testimony from Becca during cross-examination. We disagree with Newberry's assertions and affirm his conviction.

## BACKGROUND[2]

### Becca's Adoption and Family

¶2 Becca was adopted by her grandparents when she was seven years old. She was biologically related to her grandmother (Grandmother) but not her grandfather (Grandfather).[3] Grandfather was Newberry's biological grandfather. When Becca first moved in with her grandparents at the time of her adoption, Newberry lived with them for a time. After he moved out, he kept in touch primarily with Grandfather and did not see Becca for several years.

---

1. A pseudonym.

2. "In an appeal from a jury trial, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly, and we present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Kufrin*, 2024 UT App 86, n.1, 551 P.3d 416 (cleaned up).

3. Becca's biological mother was Grandmother's biological daughter.

*The Family's Move from Kansas to Arizona*

¶3      In May 2020, Becca, her siblings, and her grandparents moved from Kansas to Arizona. Becca's biological father and Newberry went to Kansas to help with the move. Becca was fourteen at the time, and Newberry was thirty-four.

¶4      The family used multiple vehicles to make the move to Arizona—"two small cars, two trucks, and a U-Haul." Initially, Newberry drove one of the trucks, and early in the drive, Becca began to ride alone with him. She "wanted to catch up with him" and "tell him about [her] life." As they drove, Newberry told Becca that she was the prettiest of her siblings and that she "had a nice body."

¶5      At the family's first overnight stop, in Amarillo, Texas, Becca slept in the truck she had been riding in because the motel room was "full." Newberry joined her in the truck. Before they went to sleep, Newberry told Becca that she "had nice breasts," and he suggested that Becca "should Facetime [her] boyfriend while [Newberry went] down on [her]." Becca understood this to mean that Newberry wanted to "perform oral sex on [her]," and she "laughed [the comment] off because [she] thought he was joking." But Newberry kept asking, and Becca eventually "pretended that [she] was sleeping so that he would stop asking."

¶6      When Becca awoke the next morning, Newberry told her that he had "jerked off while [she] was sleeping." He then said that he "wouldn't have cared" if she had been awake. Becca "didn't say anything" in response.

¶7      Later that day, as the family continued to their next stop, Becca and Newberry were again riding alone, this time in the U-Haul. Becca began to feel ill, and Newberry told her that she could put her head on his lap. She did, and while she rested, Newberry moved his hand onto her waist, then her stomach, then

her breasts. "He then slid his hand into [her] shorts" and penetrated her vagina with his fingers. Becca "just laid there," not knowing what to do, until about ten minutes later, when the family stopped at a gas station and they "all went to use the restroom." After they got back on the road, Newberry again touched Becca's vagina until she "told him to stop because it hurt."

¶8     When the family stopped again for the night—this time somewhere between Albuquerque, New Mexico, and Flagstaff, Arizona—Newberry and Becca stayed in the U-Haul. Before they fell asleep, Newberry kissed Becca, afterward telling her, "Wow. You are a good kisser." He then "tried to do sexual things again," but Becca told him to stop, concerned they were "going to get caught."

¶9     The next day, the family continued driving and eventually arrived at the home in Arizona.

*The Trip to Utah*

¶10     By the time the family arrived at the home in Arizona, Newberry had missed the flight he had planned to take back to Utah, where he lived. Grandfather suggested that Becca and her seventeen-year-old sister (Sister) drive with Newberry to Utah so they could meet Newberry's wife and children. Newberry, Becca, and Sister left for Utah the following day.

¶11     After arriving in Utah, Becca and Sister stayed with Newberry and his family in their apartment for four or five days. During that time, Newberry and Becca went on two or three walks alone at night. On one of those walks, they saw some Monster energy drink cans on a sidewalk, and Newberry began counting them, saying, "One Monster, two Monster"; "then he grabbed [Becca's] butt and said, 'Three Monster.'" Becca "just laughed."

¶12    On a subsequent walk, Newberry and Becca "were about to head back up to the apartment" when he asked her if she wanted to go for a drive. She agreed. But when they got in Newberry's car, rather than start the car, Newberry began kissing Becca. They then engaged in sexual intercourse. Their intercourse was interrupted when a truck pulled into a parking stall a couple of spots away from them, causing them to stop having sex. As they walked back to the apartment, Newberry told Becca "that he had slept with thirty-five women and [she] was the best."

¶13    Once they were in the apartment and Becca had gone to the living room where she and Sister slept, Newberry messaged Becca and asked whether she had "finished." When she responded that she had not, Newberry went to the living room, knelt in front of the recliner Becca was in and, as Sister slept on a nearby couch, attempted to pull Becca's pants down. Although Becca "told him no," "he kept trying." But "eventually he stopped."

¶14    A day or two later, Becca and Sister drove back to Arizona. During that drive, Becca told Sister about what had happened in Newberry's car. Sister told Grandfather, who told Grandmother, and Grandmother called the police.

*The Charges and the State's Notice of Rule 404(b) Evidence*

¶15    Newberry was charged with one count of unlawful sexual activity with a minor based on the sexual intercourse that occurred in Utah in Newberry's car. The case proceeded to a jury trial.

¶16    Prior to trial, the State provided notice to Newberry that it planned to introduce evidence that might fall under rule 404(b) of

the Utah Rules of Evidence.[4] Specifically, the notice alleged that before the charged offense, Newberry and Becca had "spent several days together" "outside of this jurisdiction" and that, "[d]uring this time, other sex acts [had] occurred" that were "not charged here." The notice then indicated that the State "intend[ed] to introduce evidence of [this] other conduct between" Newberry and Becca.

*The Parties' Arguments Regarding the State's Rule 404(b) Evidence*

¶17    On the day of jury selection, Counsel brought the State's rule 404(b) notice to the court's attention. The prosecutor clarified that the other incidents the State planned to introduce were of Newberry telling Becca the morning after they slept in the truck that he had "jerked off" next to her while she slept (the masturbation incident) and of Newberry inserting his fingers into Becca's vagina the next day as she laid her head on his lap in the U-Haul (the touching incident). The prosecutor said the State planned to introduce these incidents not to prove Newberry's "character or propensity to engage in sexual behavior with underaged females" but rather to show Newberry's "motive," "mindset," and "intent." The court was initially "a little bit skeptical" of whether evidence of the masturbation incident and of the touching incident was admissible under rule 404(b), saying that it found "sort of preposterous" the "suggestion that [the charged incident] was an accident."

---

4. Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). It also provides, however, that such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* R. 404(b)(2).

¶18 The prosecutor persisted, however, arguing that "the fact that there was some history between [Newberry and Becca], some comments that were made by [Newberry] before, some attempts at initiating sexual contact before, [spoke] very highly to the fact that it happened once he had an opportunity with [Becca] here in Utah." The prosecutor asserted that without evidence of the masturbation incident and of the touching incident, the charged incident would "look[] very isolated" and "strange in the eyes of the jury." The prosecutor continued,

> It's not propensity [evidence.] . . . I would call this the same criminal episode, actually. I think this is [Newberry] engaging in repeated sort of flirting or coming on to the alleged victim. It's not propensity because it doesn't speak to any other victims. It doesn't say that he has a propensity to try to engage in sex with minors, it just shows his interest, his sexual interest in the alleged victim on this occasion while they're conducting this family move.

¶19 Counsel countered by arguing that the masturbation incident and the touching incident did go to propensity and occurred at a time too attenuated from the charged incident to constitute the same criminal episode. Counsel also argued that evidence of these other incidents was "substantially more prejudicial than probative" and was therefore inadmissible under rule 403 of the Utah Rules of Evidence.

¶20 The court reserved ruling on the admissibility of evidence regarding the masturbation incident and the touching incident until the following day.

*The Court's Ruling on the State's Rule 404(b) Evidence*

¶21 The next day, before opening statements and preliminary jury instructions, the court ruled that evidence of the

masturbation incident and of the touching incident would be admissible. It explained:

> [T]he [c]ourt is persuaded that the evidence of the other two incidents [is] being offered for the proper non-character purpose of demonstrating an ongoing behavior pattern, which includes [Newberry's] abuse or pursuit of [Becca]. . . . [I]t's legitimately part of a narrative the State intends to show[,] including [Newberry's] access to and sexual pursuit of [Becca] . . . .
>
> The evidence is relevant to establishing that non-character purpose [and] . . . puts in context the victim's allegations and goes to her credibility. And while the evidence is prejudicial, the [c]ourt finds that the probative value of the evidence is not substantially outweighed by the danger of any unfair prejudice, as it seems to the [c]ourt that the question really is the jury's credibility determinations . . . [.] [T]he jurors will either believe or disbelieve the testimony based on the victim's credibility and not [on] whether she says it happen[ed] one time, or three times, or six times.

### The Evidence at Trial

¶22 During its case in chief, the State called Becca, Sister, Grandmother, and a detective (Detective) to testify. Becca recounted the masturbation incident, the touching incident, and the charged incident of sexual intercourse in Newberry's car. She also recounted the other incidents of sexual conduct by Newberry outlined above, namely (1) Newberry encouraging her to allow him to perform oral sex on her while she Facetimed her boyfriend; (2) Newberry kissing her on the last night of the move; (3) Newberry grabbing her buttocks while counting Monster

energy drink cans; (4) Newberry commenting that "he had slept with thirty-five women and [she] was the best"; and (5) Newberry—after engaging in sexual intercourse with her in his car—entering the room where Becca was staying and trying to remove her pants. Counsel did not object to Becca testifying about these additional incidents.

¶23   The prosecutor also asked Becca about her texting with Newberry during the move. Becca testified that she had used the messaging app Snapchat to communicate with Newberry. She stated that one reason for using Snapchat was because "things disappear on there." Becca acknowledged that messages exchanged on Snapchat stay on the user's phone no more than twenty-four hours unless the user "affirmatively save[s] them." She also testified that pictures and videos shared via Snapchat similarly "disappear" and become unrecoverable unless the user takes screenshots of them.

¶24   On cross-examination, Counsel asked Becca whether her phone had been "in service" during the trip. When she said it had not, Counsel asked how she had been able to use Snapchat. Becca said she had accessed the app via Wi-Fi and by using hotspots from other people's phones. Counsel then asked Becca whether she and Newberry had exchanged pictures via Snapchat. Becca said they had. When Counsel then asked Becca "what photos" they had exchanged, Becca said they were "inappropriate ones" and described them as "[n]ude pictures." Becca said that the pictures she sent Newberry included both photos taken before the move and photos taken during the move.

¶25   On redirect examination, Becca testified that she first showed Newberry some nude pictures of her while they were in the truck and that she then logged into her Snapchat account on Newberry's phone and gave him the password to the "my eyes only" part of her account, "[w]here you can hide pictures with a password." Becca then testified that she later "saw pictures of

[her] saved on [Newberry's] phone" that had come from the "my eyes only" part of her account. On recross-examination, Becca testified that the photos she showed Newberry from before the move were "photos for [her] boyfriend."

¶26 Sister then testified, recounting facts regarding the family's move, the trip she and Becca took with Newberry to Utah, her observations of Newberry and Becca, and Becca's demeanor when she disclosed the sexual intercourse with Newberry. Grandmother likewise testified about the move and her observations of Newberry and Becca during the move.

¶27 Detective testified that the contents of Becca's and Newberry's phones had been forensically extracted and that she had reviewed those extractions and found nothing of evidentiary value. She further testified that she sent a warrant to Snapchat for the contents of Becca's and Newberry's Snapchat accounts and received a report back saying the contents of any communications between Newberry and Becca were unavailable. On cross-examination, Detective explained that if a user takes a screenshot of a picture received via Snapchat, the photo can be saved to the phone, which would make it viewable in an extraction, "even if Snapchat had deleted the picture." Detective also agreed that Snapchat data on a phone "doesn't always delete."

¶28 During the defense's case in chief, Newberry and his wife testified. Newberry's wife talked about their car, their child car seats, and the size and configuration of those seats in the car. She also testified that Newberry suffered from post-traumatic stress disorder (PTSD) "from his seven years in the military." She explained that he would occasionally experience "PTSD episodes" lasting an hour and a half or longer that were "debilitating" and during which he would "duck for cover" and "shelter in place." She stated that on the night of the charged incident, she heard fireworks outside, became concerned that Newberry was having a PTSD episode, called his phone, and got

no answer, which was not unusual because he often kept his phone on silent. She testified that when Newberry and Becca returned home a few minutes later, Newberry was "having an episode."

¶29 Newberry testified that Becca had fabricated not just the charged incident but also the other alleged sexual conduct from before and after the charged incident. He stated that during his and Becca's walk on the evening of the charged incident, there were holiday fireworks that caused him to have PTSD symptoms and need to "put [his] back to the [nearby] apartments and kind of get down on [his] haunches" for about ten minutes to "calm [him]self down."

*Counsel's Closing Argument*

¶30 During closing arguments, Counsel said that even the prosecutor had "talked about how there [was] not a lot of evidence to prove [that the charged incident] happened." Counsel then acknowledged that "there [was] also just not a lot of evidence to prove it didn't happen." Thus, she implicitly cast the case as a referendum on Becca's credibility, asserting that there was a lack of corroboration for Becca's account of the charged incident and the other incidents of sexual contact. Then Counsel contended that there were "a lot of unknowns . . . when it came to the cell phone." She argued,

> [J]ust because the State[] or I tell you something[, it] doesn't mean you use that just to fill in all of your blanks. If you look at exactly what was said here today, . . . [t]here [were] allegations that there was a cell phone extraction.
>
> But . . . [Detective] did not tell you . . . how . . . extractions work. And because she didn't explain, there is nothing in evidence to tell you that

if something is extracted [from] a cell phone[,] [the extraction includes] everything in the cell phone. That's not in evidence.

Also there was this testimony about how there was a Snapchat extraction; right? What . . . we know is that [Becca] had other pictures in her Snapchat that she had saved. Otherwise, why would it still be there[,] because she had photos from before in her Snapchat[?] The only way it's there is if she saved it.

At some point those photos were also gone because [Detective] said there was nothing in the Snapchat history . . . between the two of them. I don't know if that means they were never there or she deleted them at some point.

¶31 Later, Counsel returned to the topic of Becca's phone, saying,

I talked a little about the cell phone dump . . . .

. . . .

. . . [Detective] said there was nothing of evidentiary value in the cell phone or the Snapchat dump that she saw. But what does that mean? . . . [D]oes that mean there is no evidence that [Newberry] and [Becca] communicated period? I don't know if they were even friends on Snapchat.

And that's kind of what I'd like to say is there [are] just a lot of unknowns with the phone. And I'm not going to sit here and try to tell you this is what it means because it's not in evidence. And when you

go back to deliberate, you can't consider all of the
things that . . . [were not] in testimony.

¶32    The jury convicted Newberry of engaging in unlawful
sexual activity with a minor, and Newberry filed a timely appeal.


ISSUES AND STANDARDS OF REVIEW

¶33    On appeal, Newberry contends that the district court erred
in admitting Becca's testimony about the masturbation incident
and the touching incident under rule 404(b) of the Utah Rules of
Evidence. "Generally, we review a trial court's decision to admit
evidence under rule 404(b) for an abuse of discretion." *State v.
Courtney*, 2017 UT App 172, ¶ 19, 424 P.3d 198. But "the district
court's interpretation of the Utah Rules of Evidence . . . presents a
question of law that we review for correctness." *State v. Biel*, 2021
UT 8, ¶ 21, 484 P.3d 1172.

¶34    Newberry also asserts two claims of ineffective assistance
of counsel: one based on Counsel's failure to object to Becca's
direct-examination testimony about additional sexual conduct by
Newberry toward Becca and one based on Counsel eliciting
Becca's testimony about her and Newberry exchanging nude
photos via Snapchat. "When a claim of ineffective assistance of
counsel is raised for the first time on appeal, there is no lower
court ruling to review and we must decide whether the defendant
was deprived of the effective assistance of counsel as a matter of
law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587
(cleaned up).[5]

---

5. Newberry also argues that we should reverse his conviction
based on the cumulative error doctrine. "We have held elsewhere
that the cumulative error doctrine does not apply when there is

(continued…)

ANALYSIS

I. Evidentiary Challenge

¶35    Newberry asserts that the district court should have excluded Becca's testimony about the masturbation incident and the touching incident under rules 404(b) and 403 of the Utah Rules of Evidence. For the reasons set forth below, we disagree.

¶36    As noted above, under rule 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). However, the rule provides that such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* R. 404(b)(2).

¶37    In *State v. Reed*, 2000 UT 68, 8 P.3d 1025, our supreme court applied rule 404(b) in a case involving evidence of sexual contacts with a child in addition to the charged conduct. There, the defendant, while in his late twenties, befriended a ten-year-old boy and visited him when his mother was not at home, taking him to various places and activities. *See id.* ¶¶ 2–3. "From very early in the relationship, [the defendant] began having sexual contact with the victim," and "[t]he sex acts, some twenty to thirty incidents, . . . continued over three and one-half years." *Id.* ¶ 6. Eventually,

---

no other error with which to cumulate trial counsel's non-prejudicial presumed errors." *State v. Smith*, 2025 UT App 35, ¶ 84, 566 P.3d 811 (cleaned up), *cert. denied*, 570 P.3d 660 (Utah 2025). In our analysis, we identify only one presumed error, and we determine that it did not prejudice Newberry. *See infra* note 6. Because there are no additional errors to accumulate with that presumed but individually non-prejudicial error, the cumulative error doctrine does not apply. *See Smith*, 2025 UT App 35, ¶ 84.

the defendant was charged with and convicted of, among other things, one count of aggravated sexual abuse of a child. *See id.* ¶ 1.

¶38 Under the statutory scheme at the time, to establish aggravated sexual abuse of a child, the State was required to prove, in conjunction with the charged incident of abuse, that more than five separate acts occurred that if committed in Utah would constitute one of several identified crimes against a child. *See id.* ¶ 21. In light of that scheme, the supreme court had previously held that when a defendant was charged with aggravated sexual abuse of a child, the defendant's guilt on the primary charge of sexual abuse was to be determined first by the trier of fact before evidence of the aggravating acts was adduced. *See id.* ¶ 22. Then, if the jury convicted on the primary charge, evidence of the additional acts could be presented "and a second verdict returned determining whether the defendant [was] guilty of aggravated sexual abuse or simple sexual abuse." *Id.* (cleaned up).

¶39 However, the *Reed* defendant's attorney had not requested a bifurcated trial, and the trial court had not ordered one. *See id.* ¶¶ 1, 20. On appeal, the defendant claimed that these failures constituted ineffective assistance of counsel and plain error, respectively. *See id.* ¶ 20. In response, our supreme court explained that the basis for the bifurcated procedure called for in the caselaw was "the principle that evidence of bad character or unrelated prior crimes is prejudicial because of the tendency of a fact finder to convict the accused because of bad character rather than because he or she is shown to be guilty of the offenses charged." *Id.* ¶ 23 (cleaned up). But the supreme court also observed that "notwithstanding the law's concern with bad character evidence, there are times when evidence of uncharged, related criminal acts is admissible, so long as it is not introduced for an improper purpose." *Id.* ¶ 24 (cleaned up). "Evidence of other crimes, wrongs, or acts may be admitted," the court explained, "if it has a special relevance to a controverted issue and

is introduced for a purpose other than to show the defendant's predisposition to criminality." *Id.* (cleaned up). The court noted that these principles are "formalized in rule 404(b) of the Utah Rules of Evidence" and that rule 404(b)'s analysis had "direct application to the question of evidence of aggravating acts in the guilt phase" of that case. *Id.* ¶ 25. Specifically, the court explained that to avoid the requirement of bifurcation, it had to first be shown that "the evidence of the aggravating factors [was] offered for a noncharacter purpose under rule 404(b)." *Id.*

¶40 Turning to an analysis of whether evidence of the aggravating incidents of abuse was admissible in a trial of the primary charge under rule 404(b), the court then stated,

> In cases of child abuse, including child sexual abuse, evidence of specific instances of the defendant's treatment of the child is relevant to establish not merely a general disposition for violence or ill-will towards all children, but to establish a specific pattern of behavior by the defendant toward one particular child, the victim. Likewise, the evidence of multiple instances of sexual contact with the victim in this case does not merely demonstrate [the defendant's] general character or disposition, but instead demonstrates an ongoing behavior pattern which included [the defendant's] abuse of the victim. Specifically, the evidence demonstrated the manner in which [the defendant] intensely pursued the victim over a three-and-a-half-year period in order to gain opportunity to commit the unlawful sexual acts. This pattern also revealed the extensive preparation and planning in which [the defendant] engaged to create opportunities for sexual contact with the victim.

*Id.* ¶ 26 (cleaned up). In short, the *Reed* court indicated that evidence of a defendant's "multiple instances of sexual contact" with a single child victim may be admissible under rule 404(b) to show "preparation," "planning," or "a specific pattern of behavior by the defendant toward one particular child." *Id.*

¶41 In *State v. Verde*, 2012 UT 60, 296 P.3d 673, *abrogated in part on other grounds by State v. Green*, 2023 UT 10, 532 P.3d 930, the supreme court expanded on the same general principle when it explained that under rule 404(b), the prosecution has "the right to present evidence with broad narrative value beyond the establishment of particular elements of a crime." *Id.* ¶ 28 (cleaned up). This is so, the court explained, because "people who hear a story interrupted by gaps of abstraction may be puzzled at the missing chapters in the prosecution's case" and "evidence may thus be appropriately aimed at completing the missing chapters in the prosecution's case" and allowing it "to tell a complete story." *Id.* (cleaned up). Then we relied on *Verde* in *State v. Labrum*, 2014 UT App 5, 318 P.3d 1151, to conclude that "other acts evidence may be admissible under rule 404(b) to show context" as long as the other acts evidence is "carefully limited to narrative evidence offered in support of the elements of the crime at issue." *Id.* ¶ 22.

¶42 Shortly after our opinion in *Labrum*, the supreme court in *State v. Lucero*, 2014 UT 15, 328 P.3d 841, *abrogated in part on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016, again endorsed the idea that evidence of child abuse involving the same victim and the same defendant that occurred prior to the charged act of child abuse may be admissible. *See id.* ¶ 14 n.7. But this time, the court's explanation shifted; specifically, the court no longer classified evidence of prior abuse against the same victim as "other" acts to which rule 404(b) applied yet provided an exception. *See id.* Instead, the court appears to have embraced the notion that a prior incident of child abuse against the same victim

may be deemed to be "part of [a] continuing narrative *rather than an independent act*." *Id.* (emphasis added). The court explained,

> Since rule 404(b) applies only to evidence that is *extrinsic* to the crime charged, [classifying prior incidents of abuse involving the same victim as being part of a continuing narrative] would preclude applicability of the rule altogether. This is because rule 404(b) applies only to "other" acts—if the evidence of prior acts is inextricably intertwined with the crime that is charged, . . . then rule 404(b) would not apply. Rather, the act would be considered part of the case narrative and have important probative value that bears directly on the crime charged.

*Id.* (cleaned up). Although the court concluded that "[t]he prior instance of abuse" in *Lucero* was "disconnected from" the charged incident of abuse in that case and, thus, did not apply the foregoing principle regarding intrinsic evidence, *id.*, its articulation of the principle was phrased as an endorsement.

¶43   Indeed, in *State v. Main*, 2021 UT App 81, 494 P.3d 1056, we relied on the principle set forth in *Lucero*. In *Main*, the defendant was charged with murder and eleven other crimes. *See id.* ¶¶ 9–10. "The defense successfully moved to bifurcate the [other] eleven charges from the murder charge." *Id.* ¶ 10. But at the trial on the murder charge, the district court "realized that the evidence related to the bifurcated charges was inextricably intertwined with the facts presented in the murder case," and it admitted evidence related to the bifurcated charges in the murder trial. *Id.* ¶¶ 10, 19. The defendant was convicted of murder and appealed, challenging the admission of evidence related to the bifurcated charges under rule 404(b). *Id.* ¶¶ 14, 18. Relying on *Lucero*, we rejected his challenge, explaining that because the other charges were "part of the case narrative and ha[d] important

probative value that [bore] directly on the crime charged," rule 404(b) did "not apply." *Id.* ¶¶ 18, 21 (quoting *Lucero*, 2014 UT 15, ¶ 14 n.7).

¶44 Most recently, in *State v. Blackwing*, 2025 UT 60, our supreme court reconfirmed "the distinction between intrinsic and extrinsic evidence [that it] first acknowledged" in *Lucero*. *Id.* ¶ 24 (cleaned up). The court explained that the distinction between intrinsic and extrinsic evidence "is a text-based application of [rule 404(b)] that, by its own terms, applies to 'other acts,' not to acts directly connected to the factual circumstances of the crime." *Id.* ¶ 28. It then adopted specific "articulations" of what constitutes intrinsic and extrinsic evidence to serve collectively as "the standard" "for distinguishing between facts that are part of the charged crimes that are not subject to rule 404(b) and other acts that are not." *Id.* ¶¶ 30–31. Specifically, the court stated that "intrinsic evidence is generally considered part of the case narrative and has important probative value that bears directly on the crime charged." *Id.* ¶ 30 (cleaned up). It also stated that intrinsic evidence "is directly connected to the factual circumstances of the crime and provides contextual or background information to the jury." *Id.* (cleaned up). The court now found "the 'inextricably intertwined' language in *State v. Lucero* to be unhelpful." *Id.* ¶ 31 n.3. On the other hand, the court said that extrinsic evidence "is extraneous and is not intimately connected or blended with the factual circumstances of the charged offense." *Id.* ¶ 30 (cleaned up).

¶45 In sum, since at least as early as *Reed*, our caselaw has allowed in child sexual abuse cases evidence of the defendant's uncharged acts of abuse against the same victim "to establish a specific pattern of behavior by the defendant toward one particular child." *State v. Reed*, 2000 UT 68, ¶ 26, 8 P.3d 1025 (cleaned up). Evidence of that character has since been described as evidence offered "to show context," *Labrum*, 2014 UT App 5, ¶ 22, and "evidence with broad narrative value," *Verde*, 2012 UT

60, ¶ 28. And it is now most properly denominated intrinsic evidence, to which rule 404(b) simply does not apply, so long as the uncharged acts are "part of the case narrative and [have] important probative value that bears directly on the crime charged." *Blackwing*, 2025 UT 60, ¶ 30 (cleaned up).

¶46 This sort of intrinsic evidence is often crucial in child sexual abuse cases. If a jury hears nothing more than "the bare facts of the sexual encounter charged," it will often be left with "unanswered questions"—such as why the victim would have agreed "to go along with the act" or how the defendant was able to carry it out without being caught. *State v. Truman*, 249 P.3d 1169, 1177 (Idaho Ct. App. 2010). And if those questions are unanswered, then the "break in the natural sequence of narrative evidence" will artificially render the State's case less "convincing" and increase the chances of an unjust acquittal. *Old Chief v. United States*, 519 U.S. 172, 189 (1997).

¶47 "Many sexual predators 'groom' their child victims over a period of days, months, and even years" by attempting "to develop a bond between the victim and offender and, ultimately, make the victim more receptive to sexual activity with the offender." 7 Clifford S. Fishman & Anne Toomey McKenna, *Jones on Evidence* § 57:70 (7th ed., Dec. 2024 update) [hereinafter *Jones on Evidence*]. This often includes "conduct designed to gradually acclimate the child to sexual topics and conduct." *Id.* And in many cases, the offender will begin with "less intrusive and less highly sexualized forms of sexual touching" to "desensitiz[e] the victim to future sexual contact" before later moving on to more aggressive sexual acts. *State v. Williams*, 2018 UT App 96, ¶ 20 n.8, 427 P.3d 434 (cleaned up). Thus, "where a defendant charged with abuse or molestation denies committing those acts, explicit sexual 'grooming' is highly relevant as evidence of preparation or steps toward the ultimate goal." *Jones on Evidence* at § 57:70. Accordingly, we reaffirm that evidence of uncharged sexual conduct against the same child victim that "is directly connected

to the factual circumstances of the [charged] crime and provides contextual or background information to the jury," *Blackwing*, 2025 UT 60, ¶ 30 (cleaned up), is admissible—as intrinsic evidence—because showing how the perpetrator groomed the victim bears directly on the charged sexual offense.

¶48 Moreover, our current approach—which deems such evidence to be intrinsic to the crime charged and, thus, evidence to which rule 404(b) does not apply—is sound. It is widely embraced by other jurisdictions. *See, e.g.*, *United States v. Betts*, 911 F.3d 523, 529–30 (8th Cir. 2018) (classifying evidence of sexual grooming as intrinsic evidence to which federal rule 404(b) does not apply); *State v. Ard*, 361 So. 3d 473, 484 (La. Ct. App. 2022) (holding that because the defendant's "statements to [the victim] provided narrative completeness to a continuous chain of events that began with defendant 'grooming' the victim for rape years before the offenses," the statements were "part of 'this crime,' rather than being 'other crimes' evidence"); *Chaparro v. State*, 630 S.E.2d 645, 648 (Ga. Ct. App. 2006) ("That [the defendant] provided cigarettes and alcohol to [his victim] was admissible . . . since his actions in doing so were relevant to show the manner in which [he] 'groomed' the child for victimization."). *But see, e.g.*, *State v. Dinkins*, 868 S.E.2d 181, 188 (S.C. Ct. App. 2021) (holding that evidence of "a pattern of grooming" was admissible *under rule 404(b)* as "evidence of [the defendant's] motive and intent"). It has historical roots in our own caselaw. *See State v. Hayes*, 46 P. 752, 754 (Utah 1896) ("The surrounding circumstances . . . may always be shown to the jury along with the principal facts."). And, as noted, it has been recently reconfirmed by our supreme court. *See Blackwing*, 2025 UT 60, ¶¶ 23–33.

¶49 Newberry resists a conclusion that the masturbation incident and the touching incident were admissible under the principle espoused in *Reed* because there is a procedural incongruity between this case and *Reed*. Newberry is correct that in *Reed* the defendant raised rule 404(b) while making an

ineffective assistance of counsel claim and a plain error claim, *see* 2000 UT 68, ¶ 20, while Newberry presents a preserved claim of ordinary error in the district court's evidentiary ruling. But as we have demonstrated, the principle from *Reed* regarding grooming evidence—namely, that it is admissible (albeit now as intrinsic evidence) "to establish a specific pattern of behavior by the defendant toward one particular child," *id.* ¶ 26 (cleaned up)—is valid regardless of a case's procedural posture.

¶50 Newberry also attempts to distinguish *Reed* on the facts. He notes that *Reed* involved evidence of over twenty sex act incidents as well as evidence of scores of other interactions showing that the defendant "intensely pursued the victim over a three-and-a-half-year period." *Id.* ¶¶ 6, 26. He then contrasts those facts with the circumstances of this case, where, in his words, "the State provided two prior incidents, which occurred over one month." He further contrasts the circumstances of this case on the basis that his "contact with Becca came about because of requests from family members rather than any 'extensive preparation and planning'" on his part. (Quoting *id.* ¶ 26.) However, grooming is grooming, whether it occurs over the course of a few days, a week, a month, or years. And it is grooming whether it is accomplished solely by the defendant's own efforts or by the defendant taking advantage of access to the child that is provided by others.

¶51 Finally, Newberry asserts that the district court abused its discretion by not excluding evidence of the masturbation incident and of the touching incident under rule 403 of the Utah Rules of Evidence. Under rule 403, relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." In his principal brief, Newberry explains rule 403 and notes the two cases cited by the district court when it made its rule 403 determination. But he does not meaningfully explain why evidence of the masturbation incident and touching incident posed a danger of *unfair* prejudice that *substantially* outweighed its probative value in showing a pattern of grooming

by Newberry toward Becca. Accordingly, we are unpersuaded that the district court abused its discretion under rule 403.

¶52    For the foregoing reasons, we reject Newberry's claim that the district court abused its discretion by admitting evidence of the masturbation incident and of the touching incident.

## II. Ineffective Assistance of Counsel

¶53    Newberry also makes two claims of ineffective assistance of counsel. First, he contends that Counsel rendered ineffective assistance by failing to object to Becca's testimony concerning Newberry's additional uncharged sexual conduct toward Becca. Second, he asserts that Counsel rendered ineffective assistance by eliciting testimony from Becca regarding her and Newberry's exchange of nude photos.

¶54    To establish a valid claim of ineffective assistance of counsel, Newberry "must show that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim . . . ." *State v. Hararah*, 2023 UT App 77, ¶ 28, 534 P.3d 1129 (cleaned up), *cert. denied*, 540 P.3d 79 (Utah 2023). Here, we resolve each of Newberry's claims under the deficient performance prong, concluding that in each instance he has failed to demonstrate deficient performance.

### A.    Failure to Object

¶55    Newberry asserts that Counsel's failure to object to Becca's testimony regarding incidents of sexual conduct between her and Newberry other than the masturbation incident and the touching incident constituted deficient performance. However, the district court had already ruled that evidence of the masturbation incident and of the touching incident was admissible to

"demonstrat[e] an ongoing behavior pattern, which include[d] [Newberry's] abuse or pursuit of" Becca because it was "legitimately part of a narrative the State intend[ed] to show" regarding Newberry's "access to and sexual pursuit of" Becca. And because evidence of Newberry's additional sexual conduct toward Becca would have been admissible under the same rationale, Counsel could have reasonably decided that an objection to this additional evidence would have been futile. This is especially so given our decision that the district court's evidentiary ruling was consistent with a proper application of Utah law. "Where counsel could have reasonably believed that an objection was futile, counsel has not performed deficiently" in electing not to make such an objection. *State v. Soto*, 2022 UT App 107, ¶ 31, 518 P.3d 157 (cleaned up). Thus, Newberry's first ineffective assistance claim fails on this basis.[6]

---

6. Newberry makes a separate argument regarding one of the additional incidents of sexual contact. Specifically, he notes that "the State elicited testimony that *after* [the charged incident], once Becca and [Newberry] were back in the apartment, [Newberry] attempted to pull Becca's pants down and initiate sexual activity while [Sister] was sleeping on the couch next to [Becca]." Newberry implies that Counsel should have objected to the evidence of this incident because this incident was not part of the grooming that led up to the charged incident. But even if we assume, without deciding, that Counsel performed deficiently by failing to object to this incident, that deficient performance did not prejudice Newberry's case. Newberry has not explained how if only this evidence—and not the evidence of the acts leading up to the charged conduct—had been omitted, he would likely have obtained a better result at trial. *See generally State v. Hards*, 2015 UT App 42, ¶ 18, 345 P.3d 769 ("A defendant suffers prejudice when, absent the deficiencies of counsel's performance, there is a

(continued…)

B.      Eliciting Testimony Regarding Nude Photos

¶56   Finally, Newberry contends that Counsel rendered deficient performance by eliciting testimony from Becca about the nude photos she and Newberry exchanged via Snapchat. We determine that Counsel's conduct in this regard was the product of deliberate and reasonable trial strategy and, thus, did not amount to deficient performance.

¶57   "When determining whether counsel rendered objectively deficient performance, we consider all the circumstances and indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Miles*, 2020 UT App 120, ¶ 38, 472 P.3d 978 (cleaned up). "Furthermore, we give wide latitude to trial counsel to make tactical decisions and will not question such decisions unless there is no reasonable basis supporting them." *Id.* (cleaned up).

¶58   Here, it is apparent that Counsel's eliciting of testimony from Becca about exchanging nude photos with Newberry was a deliberate tactical decision. During her closing argument, Counsel suggested that there was not a lot of evidence tending to prove the charged incident happened, and she acknowledged that

---

reasonable likelihood that the defendant would have received a more favorable result at trial."). And we are not persuaded he would have obtained a better result. Becca's account of what happened after the two returned to the apartment did not offer additional support for her description of the sexual intercourse that occurred in Newberry's car because, as with Becca's testimony regarding the conduct in the car, there was no corroborating evidence that anyone else witnessed Newberry kneel in front of Becca in the apartment and attempt to persuade her to continue engaging in sexual acts. Thus, we are not convinced that the jury relied on the apartment evidence such that exclusion of that evidence would have impacted the verdict.

"there [was] also just not a lot of evidence to prove it didn't happen." Thus, she implicitly cast the case as a referendum on Becca's credibility. In order to attack Becca's credibility, Counsel had quite clearly decided to try to demonstrate that there were credibility problems with Becca's testimony regarding her Snapchat communications with Newberry and to thereby imply that there must also be credibility problems with Becca's testimony regarding Newberry's sexual conduct.

¶59 Apparently to this end, Counsel questioned Becca about her Snapchat communications, eliciting testimony that Becca had saved nude photos of herself in the "my eyes only" portion of her Snapchat account, that she had allowed Newberry to access those photos on his phone, and that she had seen at least one of those photos saved on Newberry's phone. From Detective, Counsel then elicited testimony that the report of the forensic extractions of Becca's and Newberry's phones did not produce anything of evidentiary value. While the evidence of Newberry and Becca exchanging nude photos was potentially damaging to Newberry, it also allowed Counsel to call Becca's credibility into question based on the apparent lack of evidence of such photos in the forensic phone extractions despite Becca saying that nude photos of her had been saved to both her phone and Newberry's phone.

¶60 Moreover, Becca's testimony about exchanging nude photos opened the door to Counsel being able to elicit an acknowledgement from Becca that she showed Newberry nude photos of herself as they rode together in the truck; that the nude photos of her that were already on her phone were originally intended for her boyfriend; and that Becca took additional nude photos of herself during the trip for Newberry, thus perhaps painting Becca in a negative light as well.

¶61 We have previously determined that eliciting evidence that "paint[s] [a] victim[] . . . in a negative light" and makes the victim "appear to be unsympathetic" is a reasonable defense tactic. *State*

*v. Whitchurch*, 2024 UT App 108, ¶¶ 57–58, 554 P.3d 1166, *cert. denied*, 564 P.3d 960 (Utah 2025). And we have also previously said that "deciding between the pros and cons of allowing the jury to hear evidence that has the potential to cut both for and against a defendant's case is a quintessentially tactical decision, which we will not question unless there is no reasonable basis supporting it." *Id.* ¶ 58 (cleaned up). Therefore, because we cannot say that Counsel's decision to elicit Becca's testimony regarding the exchange of nude photos constituted an unreasonable strategy, it did not amount to deficient performance, and on that basis Newberry's second claim of ineffective assistance of counsel fails.

## CONCLUSION

¶62 The district court did not err in admitting Becca's testimony regarding the masturbation incident and the touching incident. Counsel did not render ineffective assistance by not objecting to testimony regarding other incidents of inappropriate comments and contact between Becca and Newberry. Nor did Counsel render ineffective assistance by eliciting Becca's testimony regarding her exchange of nude photos with Newberry. We therefore affirm Newberry's conviction.

—————